UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

LORI DUNLEAVY,                        :
                                      :
        Plaintiff                     :   No. 3:13-CV-2060
                                      :
    vs.                               :   (Complaint Filed 8/1/13)
                                      :
CAROLYN W. COLVIN, ACTING             :
COMMISSIONER OF SOCIAL                :   (Judge Munley)
SOCIAL SECURITY,                      :
                                      :
        Defendant                     :

**MEMORANDUM**

**Background**

        The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff Lori Dunleavy's claim for social security
disability insurance benefits.

        Disability insurance benefits are paid to an individual
if that individual is disabled and "insured," that is, the
individual has worked long enough and paid social security taxes.
The last date that a claimant meets the requirements of being
insured is commonly referred to as the "date last insured."  It
is undisputed that Dunleavy met the insured status requirements
of the Social Security Act through December 31, 1999.  Tr. 23-24
and 138.  In order to establish entitlement to disability
insurance benefits Dunleavy was required to establish that she
suffered from a disability on or before that date. 42 U.S.C. §
423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo
v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Although Dunleavy's insured status expired at the end of 1999 she did not protectively file[1] her application for disability insurance benefits until October 7, 2010. Tr. 86 and 220.[2]  The application was initially denied by the Bureau of Disability Determination on December 27, 2010.[3] Tr. 188-191. On February 23, 2011, Dunleavy requested an administrative hearing. Tr. 86 and 192-193.  After about 12 months had passed, a hearing was held before an administrative law judge on February 16, 2012. Tr. 86 and 131-186. Dunleavy was represented by an attorney at the hearing and Dunleavy is represented by the same attorney in the present appeal.[4] Id.

Dunleavy claimed that prior to her date last insured she suffered from severe and frequent migraine headaches, fatigue and memory problems which prevented her from engaging in full-

_____

1. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2. References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of the Answer on November 22, 2013.

3. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.  Tr. 188.

4. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

time employment on sustained basis. Tr. 157-170; Doc. 9, Plaintiff's Brief, p. 2-3.  The impetus for Dunleavy's conditions was an arterial aneurysm in the brain which resulted in a subarachnoid hemorrhage. Id.  This aneurysm occurred in March of 1994. Id.  Dunleavy underwent brain surgery to repair the aneurysm which involved the removal of a portion of Dunleavy's skull (a bone flap), the repair of the aneurysm using a metallic clip[5] and the replacement of the bone flap using metallic sutures. Tr. 428-431. Dunleavy claims that the metallic clip and sutures make her susceptible to the adverse effects of electromagnetic fields, including those emanating from computer screens, microwave ovens and television sets, and that those electromagnetic fields trigger her headaches which last for days at a time. Tr. 157-170 and 255.

Dunleavy was married in 1996. Tr. 156. Dunleavy's

---

5. "Clipping is surgical procedure performed to treat a balloon-like bulge of an artery wall known as an aneurysm. As an aneurysm grows it becomes thinner and weaker. It can become so thin that it leaks or ruptures, releasing blood into the spaces around the brain - called a subarachnoid hemorrhage.  A neurosurgeon places a tiny clip across the neck of the aneurysm to stop or prevent the aneurysm from bleeding."  Aneurysm Clipping, Mayfield Clinic for Brain & Spine, http://www.mayfieldclinic.com/PE-Clipping.htm (Last accessed September 11, 2014). The clips presently are made of titanium.  However, in 1994 the clip utilized to repair Dunleavy's aneurysm was made of an iron compound. The sutures to secure the bone flap were also apparently made of an iron compound. There were several reasons for the change in the composition of the clips but one the most well-known reasons was the wide use of MRI technology and the stong magnets associated therewith. What Are the Dangers of MRI Scans?, eHow.com, http://www.ehow.com/about_5104689_dangers-mri-scans.html (Last accessed September 11, 2014).

husband, who obtained a Master of Science Engineering - Management Technology degree (on an unspecified date) from the University of Pennsylvania appeared and testified at the administrative hearing. Tr.306.  Mr. Dunleavy wrote a report entitled *Electromagnetic Radiation Induced Cranial Headaches* in which he opined that Mrs. Dunleavy's headaches were related to exposure to electromagnetic fields, including those emanating from TVs, printers and computer screens. Tr. 289-294.  He further opined that the electromagnetic fields triggered a reaction in the bone flap suture wires and aneurysm clip which Mrs. Dunleavy retained following her aneurysm surgery and that was the cause of her headaches. Tr. 394. He also felt that the headaches were caused by the weather at least 10 percent of the time. 293. There is no indication that the report was peer reviewed (by someone with expertise in the area of electromagnetism) or that the assertions set forth in the report were verified. A review of Mr. Dunleavy's resume reveals that his degree in engineering and his career focused more on the management and marketing side of the engineering field and not the pure science/research relating to electromagnetic fields (EMFs) or the medical implications of EMFs. Id.

Mrs. Dunleavy did not appear in person at the administrative hearing but her testimony was received by way of a telephone call placed to her at her home. She used a hand-held

4

telephone and during her testimony the phone's battery went dead and her testimony was temporarily interrupted. Tr. 164-165 and 169. After being reconnected, the administrative law judge asked her what devices induced her headaches and she mentioned computers, electric motors, ceiling fans, and printers but when asked about telephones she stated they did not cause her to have headaches.[6] Tr. 170.  Mrs. Dunleavy testified that she did not apply for disability benefits until 2010 because it was at that time she became convinced that her condition was permanent and caused by exposure to electrical equipment. Id.  Mrs. Dunleavy acknowledged that technology had advanced since 1999 and it was " a lot" more difficult to avoid electromagnetic field triggers. Tr. 172.

Dunleavy contends that her frequent migraines and cognitive impairments continue to the present day. Id.  Dunleavy does not contend that she suffers from illnesses or conditions that would prevent her from engaging in the exertional and nonexertional demands of the full-range of work other than with respect to the pain and cognitive problems associated with her migraine headaches.  A review of the medical records does not reveal any physical exertional limitations associated with her alleged migraine headaches.

On February 23, 2012, the administrative law judge

---

6. It is generally accepted that an electromagnetic field can emanate from a cordless telephone.

issued a decision denying Dunleavy's application. Tr. 86-93. As will be explained in more detail *infra* the administrative law judge found that Dunleavy failed to prove that she met the requirements of a listed impairment or suffered from work-preclusive functional limitations. Id.  Instead based on the testimony of a vocational expert the administrative law judge found that Dunleavy on and prior to her date last insured had the ability to perform several unskilled jobs, including light work[7]

_____

7. The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

> (c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If

as a handpacker and locker room attendant. Tr. 92. On April 16, 2012, Dunleavy filed a request for review with the Appeals Council. Tr. 70. After about 14 months had passed, the Appeals Council concluded that there was no basis upon which to grant Dunleavy's request for review. Tr. 1-4.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.[8]

---

    someone can do medium work, we determine that he or she
    can do sedentary and light work.

    (d) *Heavy work*.  Heavy work involves lifting no more
    than 100 pounds at a time with frequent lifting or
    carrying of objects weighing up to 50 pounds. If
    someone can do heavy work, we determine that he or she
    can also do medium, light, and sedentary work.

20 C.F.R. § 404.1567.

8. After the ALJ issued her decision, Dunleavy submitted to the Appeals Council additional records which related to treatment Dunleavy received both before and after her date last insured. Tr. 71-82 and 440-574. Evidence submitted after the administrative law judge's decision cannot be used to argue that the administrative law judge's decision is not supported by substantial evidence.  Matthews v. Apfel, 239 F.3d 589, 594-595 (3d Cir. 2001).  The only purpose for which such evidence can be considered is to determine whether it provides a basis for remand under sentence 6 of section 405(g), 42 U.S.C.  Szubak v. Secretary of Health and Human Servs., 745 F.2d 831, 833 (3d Cir. 1984).  Under sentence 6 of section 405(g) the evidence must be "new" and "material" and a claimant must show "good cause" for not having incorporated the evidence into the administrative record.  Id.  The Court of Appeals for the Third Circuit explained that to be material "the new evidence [must] relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." Id.  At the administrative hearing Dunleavy's attorney informed the administrative law judge that the record was complete and there was nothing further to submit. Tr. 138. Dunleavy  has not

Dunleavy then filed a complaint in this court on August 1, 2013. Supporting and opposing briefs were submitted and the appeal became ripe for disposition on February 27, 2014, when Dunleavy elected not to file a reply brief.

Dunleavy, who was born in the United States on April 16, 1959,[9] obtained a Master's degree in human resource management from the University of Scranton in 1993 and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 140-141, 220, 240, 251 261 and 263.

Dunleavy's past relevant work[10] was in the area of personnel/human resource management and retail sales and classified as semi-skilled to skilled, sedentary to light work. Tr. 174-175.  Testing in 2007 revealed that Dunleavy had a full scale IQ of 101, placing her in the average range of intelligence. Tr. 317. Dunleavy has a valid driver's license. Tr.

---

explained how the evidence submitted to the Appeals Council provides a basis for a sentence 6 remand, including how she meets the "good cause" requirement.

9. At the time of Dunleavy date last insured on December 31, 1999, she was 40 years of age and considered a "younger individual" whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. § 404.1563(c).  The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

10. To be considered past relevant work, the work must amount to substantial gainful activity. Pursuant to Federal Regulations a person's earnings have to rise to a certain level to be considered substantial gainful activity.

142.

Records of the Social Security Administration reveal that Dunleavy had earnings in the years 1975 through 1980, 1984 through 1994, 2002, 2006 and 2007. Tr. 215.  Dunleavy's earnings in 2002, 2006 and 2007 did not amount to substantial gainful activity. Id.  Dunleavy's highest earnings were during the period 1986 though 1994 when she was employed in the personnel management and human resources field and her average annual income was $19,547.77. Tr. 215 and 226. Dunleavy's total reported earnings from 1975 through 2007 were $188,728.49. Id.  Dunleavy had no reported earnings in the years 1981 through 1983, 1995 through 2001, 2003 through 2005 and after 2007. Id.  Dunleavy's last employment was as an inserter for a newspaper company in 2007. Tr. 142 and 298.  However, Dunleavy received vocational training since 2007. Tr. 141-142 and 272-278.  In February, 2009, Dunleavy agreed to an individualized plan for employment that included training in computer programming and assistive technology. Tr. 275.  Also, in 2010 she received computer training. Tr. 141-142.

In a "Function Report - Adult" submitted during the administrative proceedings, Dunleavy indicated that she performed a range of daily activities. Tr. 246-255.  Dunleavy lived with her husband. Id.  She stated that she had no problem with her personal care "unless [she had] a migraine;" she needs no reminders to take care of personal needs or medications; she is able to prepare simple meals; she engages in cleaning, laundry and ironing when she does

9

not have a migraine; she is able to drive and ride in a motor vehicle; she can go out alone; she is able to go shopping for groceries and clothing; she entertains herself by reading on a daily basis and doing crossword puzzles twice a month; she has daily contact with other individuals by telephone and emails; and she attends church on a regular basis. 246-252.  In the "Function Report," Dunleavy when asked to check items which her "illnesses, injuries, or conditions affect" did <u>not</u> check standing, reaching, walking, sitting, kneeling, hearing, stair climbing, seeing, using hands, and getting along with others. Tr. 253.

> For the reasons set forth below we will affirm the decision of the Commissioner denying Dunleavy's application for disability insurance benefits.

**<u>STANDARD OF REVIEW</u>**

> When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  <u>See</u> <u>Poulos v. Commissioner of Social Security</u>, 474 F.3d 88, 91 (3d Cir. 2007); <u>Schaudeck v. Commissioner of Social Sec. Admin.</u>,  181 F.3d 429, 431 (3d Cir. 1999); <u>Krysztoforski v. Chater</u>, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  <u>Id.</u>; <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001)("Where the

ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. <u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from

11

its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  <u>Mason</u>, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating claims for disability insurance benefits.  See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[11] (2) has an impairment that is severe or a combination of impairments that is severe,[12] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[13] (4) has the residual

---

11. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

12. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

13. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the

functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[14]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities.  Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will review the relevant medical records.  The important period for our consideration is from March, 1994 through December 31, 1999.  Records after December 31, 1999, are only relevant to the extent that they support or detract from Dunleavy's claim that she suffered from frequent disabling migraine headache, fatigue and cognitive problems on and prior to December

---

sequential evaluation process.

14. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

31, 1999.

It is undisputed that Dunleavy prior to March 9, 1994, was in excellent health. Tr. 432. On that date Dunleavy visited the Chester County Hospital with a severe headache accompanied by "transient confusion and vomiting." Id.  A CT scan performed at Chester County Hospital revealed a subarachnoid hemorrhage. Id. After a spinal tap confirmed the presence of blood in her spinal fluid, Dunleavy was transferred on the same day to Paoli Memorial Hospital for treatment. Id.

Upon arrival at Paoli Memorial Hospital, Dunleavy underwent Computed Tomography (CT) Angiography (Angiogram) of the brain which revealed "a sizeable anterior communicating artery aneurysm" on the right side of the brain Tr. 432 and 435. The next day, March 10th, Dunleavy underwent a successful surgical clipping of the aneurysm performed by Dean C. Rich, M.D. Tr. 428-431 and 435.

Shortly after the surgery Dunleavy had several problems including cerebral vasospasm[15] and respiratory distress requiring reintubation.[16] Tr. 435. However, Dunleavy "gradually improved" and was discharged from Paoli Hospital on April 1, 1994, and transferred

---

15. Cerebral vasospasm is the constriction of arteries in the subarachnoid space of the brain and is not uncommon when an individual suffers from a brain aneurysm. If not alleviated the cerebral vasospasm can result in ischemia (insufficient blood flow) and tissue death.

16. Intubation is the insertion of a tube into the patient's airway to protect the airway from collapsing and for the delivery of oxygen or anesthesia, or both. Reintubation is merely intubation performed a second time.

15

to Bryn Mawr Rehabilitation Hospital. Tr. 435. At the time of her discharge from Paoli Hospital, Dr. Rich opined that Dunleavy was only "slightly" mentally slow and she was quickly reoriented when she occasionally became confused. Tr. 433. Dr. Rich anticipated that Dunleavy would have a full neurological recovery. Id.

Dunleavy received rehabilitation therapy at Bryn Mawr for two weeks and was discharged from that facility on or about April 14, 1994. Tr. 312 and 435. During her stay at Bryn Mawr, Dunleavy underwent speech therapy, physical therapy, occupational therapy and dysphagia[17] treatments. Tr. 312.

On April 19, 1994, Dunleavy had a follow-up appointment with Dr. Rich at Chestmont Neurosurgical, Inc. Tr. 435. Dr. Rich examined Dunleavy and opined that she was "totally neurologically normal." Id. Dr. Rich further stated that Dunleavy's "affect flattening and short term memory noted at the time of her transfer to the rehabilitation hospital have all but disappeared" and that Dunleavy would have "a full return to normal activities." Id. Dr. Rich recommended continued outpatient therapy at Bryn Mawr Rehabilitation Hospital and expected Dunleavy "to return to at least part-time employment in the next two to four weeks." Id.

There are only three other medical records contained in the administrative record from the period prior to Dunleavy's date last insured which were presented to the administrative law judge: (1) a record of an appointment with Dr. Rich on September 27, 1994;

---

17. Dysphagia is defined as "difficulty in swallowing." Dorland's Illustrated Medical Dictionary, 579 (32nd Ed. 2012).

a record of an appointment with John B. Chawluk, M.D., a
neurologist, dated May 6, 1999; and (3) a record of an appointment
with Dr. Chawluk dated December 3, 1999, only 28 days before
Dunleavy's date last insured. Tr. 339-341 and 436.

Dr. Rich in the report of the September 27, 1994,
appointment stated that Dunleavy had "return[ed] to full-time
employment only to find that not only was she excessively fatigued
after even a few hours, but she also felt she was not up to her
usual standards."[18] Tr. 436. Dunleavy reported that she was easily
distracted and "perhaps" had some memory problems when fatigued. Id.
Dr. Rich's examination of Dunleavy did not reveal any "obvious
neurologic abnormality" but did note that Dunleavy may have "islands
of cognitive loss that are apparent under stress or when fatigued."
Id. Dr. Rich opined that "it is a bit too early to make a final
opinion as to her employment disability" but he "would certainly
prefer if her employer would allow her to work anywhere from two to
four hours per day with supervision to document any errors[.]" Id.
Dr. Rich did not opine that Dunleavy was unable to engage in less
demanding unskilled work. Id. Furthermore, Dr. Rich did not
indicate that Dunleavy complained of frequent headaches only
fatigue, distractibility and "perhaps" memory problems. Id.

After the passage of about five years, Dunleavy on May 6,

18. In a medical record of a neurological/psychological
evaluation completed in November of 2007 which was submitted to
the administrative law judge it was reported that Dunleavy
returned to skilled work "as a supervisor in Human Resources" in
June of 1994 and resigned in October 1994. Tr. 312.

1999, commenced receiving medical care from Dr. Chawluk. Tr. 312 and 340-341. Dunleavy told Dr. Chawluk that she first developed "a 'severe migraine'" six months after her aneurysm surgery.[19] Tr. 340. Dunleavy further stated that since six months after her surgery she has had a migraine headache every two months until more recently when the frequency had increased to every one or two weeks. Id. Dunleavy reported that she treated her headaches with Tylenol, naproxen or ibuprofen. Id.  When Dr. Chawluk reviewed Dunleavy's systems, Dunleavy reported "fatigue and lassitude"[20] but also indicated that she is an "excellent artist" who does "some drawing

---

19. Dunleavy's surgery occurred in March, 1994. Consequently, her first alleged severe migraine occurred in January, 1995. Notably, the medical records of five appointments from January 10, 1995 through July 27, 1995, at Bryn Mawr Rehabilitation Hospital with David F. Long, M.D., a neurologist, which were submitted to the Appeals Council are devoid of any mention of complaints of headaches. Tr. 445-452. The first mention of a headache occurred at an appointment with Dr. Long on September 26, 1995. Tr. 443. Dunleavy reported that the headache last 3 days but "passed without any changes in her neurologic status and without intervention" and that although she "continues to get occasional headaches" that they "are mild." Id.  The results of a physical examination performed by Dr. Long were completely normal. Id. Dr. Long on November 2, 1995, after examining Dunleavy reported that Dunleavy did well on a recent vocational evaluation and noted that the recommendation was that Dunleavy pursue "vocational opportunities in the area of her prior experience in terms of human resources but in a situation with a lesser degree of responsibility." Tr. 442. At an appointment on February 13, 1996, Dunleavy told Dr. Long that she had infrequent headaches, she was not taking any current medications and that "overall the headaches [were] not debilitating." Tr. 440.  The results of a physical examination performed on that date were completely normal. Id.

20. Lassitude is defined as weakness and exhaustion. Dorland's Illustrated Medical Dictionary, 1007 (32nd Ed. 2012).

at home" and that "[s]he and her husband are interested in art collecting and the mounting and framing of artwork." Id.  The results of a physical examination were completely normal, including she had a normal gait and was able to heel, toe and tandem walk.[21] Id.  Dr. Chawluk recommended that Dunleavy take magnesium and riboflavin (vitamin B2) supplements and prescribed the drug Maxalt as needed for her headaches.[22] Tr. 340-341.

At the appointment with Dr. Chawluk on December 3, 1999, Dunleavy reported that the magnesium and B2 supplements reduced the frequency of her headaches and that her headaches "respond[ed] very well to the Maxalt[.]" Tr. 339. She reported only one headache that was not alleviated by taking Maxalt. Id.  The results of a mental status and physical examination were completely normal and Dr. Chawluk scheduled a follow-up appointment. Id.

The first appointment with Dr. Chawluk after the date last insured occurred on June 21, 2000. Tr. 338.  On that date Dunleavy reported "having headaches 'in spurts'" Id. The results of a mental status and physical examination were completely normal. Id.  At an appointment on December 5, 2000, Dunleavy reported "averaging maybe

---

21. A tandem walk or gait is a method of walking where the toes of the back foot touch the heel of the front foot at each step.

22. Maxalt (generic rizatriptan) "is a headache medicine that narrows the blood vessels around the brain. Rizapritrin also reduces substances in the body that can trigger headache pain, nausea, sensitivity to light and sound, and other migraine symptoms. . . . Maxalt will only treat a headache that has already begun. It will not prevent headaches or reduce the number of attacks." Maxalt, Drugs.com, http://www.drugs.com/maxalt.html (Last accessed September 13, 2014).

one headache per week" but that the Maxalt continued to "work well."
Tr. 337. The results of a mental status and physical examination
were completely normal. Id.

From May 31, 2001, through May 9, 2011, Dunleavy had 22
appointments with Dr. Chawluk. Tr. 321-336, 346-351 and 389. During
2001 through 2003 the medical records reveal that Dunleavy reported
more frequent headaches but that the frequency and severity ebbed
and flowed. Id. For example on August 14, 2002, Dr. Chawluk stated
that Dunleavy was having 5 migraines per month but then on December
13, 2002, he reported that her headaches had "improved
dramatically." Tr. 333-334. The results of mental status and
physical examinations during 2001 through 2003 were completely
normal other than on May 31, 2001, when it was noted that "her
affect remain[ed] somewhat subdued." Tr. 332-336. During 2004
through 2006, Dunleavy's medical treatment records from Dr. Chawluk
do not reference the frequency or severity of Dunleavy's headaches.
Tr. 325-330. The results of mental status and physical examinations
during 2004 through 2006 were completely normal. Id.

At an appointment with Dr. Chawluk on September 7, 2007,
Dunleavy was accompanied by her husband. Tr. 323-324. Dunleavy's
husband reported to Dr. Chawluk that she was disabled at least five
times per month as the result of migraine headaches. Tr. 323. The
results of a physical examination performed by Dr. Chawluk were
completely normal, including Dunleavy had normal muscle tone, bulk,
strength and coordination throughout and her gait was normal. Id.
At the appointment both Dunleavy and her husband questioned her

20

cognitive abilities and Dr. Chawluk subsequently referred Dunleavy to David Nicodemus, MA, a clinical neuropsychologist, for an evaluation. Tr. 311 and 323. That evaluation took place on November 8, 2007. Tr. 311-320.

On March 28, 2008, Dunleavy accompanied by her husband had an appointment with Dr. Chawluk at which Dr. Chawluk reviewed with Dunleavy and her husband the results of the neuropsychological evaluation. Tr. 322. Dr. Chawluk informed Dunleavy and her husband that Dunleavy had a mild neurocognitive disorder, and that her "neuropsychological and cognitive skills [were] at least solidly in the average range." Id. Dunleavy's husband continued to report that Dunleavy was disabled five days a month as the result of headaches. Id. The results of a physical examination performed by Dr. Chawluk were completely normal, including Dunleavy had normal gait. Id. Dr. Chawluk adjusted Dunleavy's medication regimen at her next visit on October 8, 2008, because she continued to complain of frequent headaches. Tr. 321. In the report of that appointment Dr. Chawluk states that Dunleavy "continued to be disabled by her headaches as well as her cognitive impairments."[23] Id.

---

23. Dr. Chawluk did not specify if this was his assessment of Dunleavy's abilities or whether this was a subjective complaint by Dunleavy. Furthermore, Dr. Chawluk did not specify whether or not he was referring only to Dunleavy's past relevant work as a human resource manager or to all types of work, including unskilled, light work and he did not specify the onset date of Dunleavy's disability and whether it had lasted or was expected to last for 12 or more continuous months. To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected

At three appointments with Dr. Chawluk in 2009 Dunleavy continued to complain of headaches which she attributed to the weather. Tr. 349-351. The results of physical examinations remained essentially normal other than at the appointment on January 9, 2009, it was noted that Dunleavy had "slight unsteadiness with tandem gait." Id. Dr. Chawluk continued to treat Dunleavy's headaches with medications. Id. Dr. Chawluk's notes of the last appointment in 2009 which occurred on August 24th indicate that Dunleavy was stable and Dunleavy and her husband were contemplating a vacation out west before her next six-month follow-up appointment with him. Tr. 349.

In 2010, Dunleavy had three appointments with Dr. Chawluk at which she continued to complain of headaches. Tr. 346-348. Dunleavy on January 21, 2010, reported that because of weather changes in January of that year "she had more headaches." Tr. 348. The results of a physical examination on that date were completely normal, including she had a normal gait. Id. At an appointment in May Dunleavy and her husband for the first time asserted that her headaches were associated with exposure to "electromagnetic forces." Tr. 347. The results of a physical examination were normal. Id. When Dunleavy and her husband returned on November 9th for the third appointment in 2010 Dunleavy and her husband spent a "considerable" amount of time discussing their electromagnetic force theory. Tr. 347. Dr. Chawluk referred Dunleavy to the Jefferson Headache Center

---

to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

to see if it had any interest in the potential relationship between electromagnetic forces and Dunleavy's migraines. Id.

On February 15, 2011, William Young, M.D., at the Jefferson Headache Center examined Dunleavy. Tr. 412-419. Dunleavy at that appointment reported that her energy was normal and she had no problem with her sleep pattern. Tr. 413-414. The results of a mental status and physical examination were completely normal, including she had normal muscle strength, coordination, sensation, and gait. Tr. 416-418. Dunleavy's memory was intact for recent and remote events, and there was no reported problem with her attention and concentration. Tr. 417.  Dr. Young thought that Dunleavy's headaches may be caused by medication overuse and described her report of triggers as "unusual." Tr. 418.  Dr. Young adjusted Dunleavy's medications and opined that it would be best to "move toward [a] more effective treatment paradigm than pursuing the electromagnetic field hypothesis." Tr. 419.

On May 19, 2011, Dunleavy had an appointment with Dr. Chawluk at which she continued to complain of migraine headaches but it was reported that the adjustment to her medications by Dr. Young was helping. Tr. 389.  The results of a physical examination performed by Dr. Chawluk were completely normal other than it was observed that Dunleavy had mild difficulty with tandem gait. Id. Dr. Chawluk scheduled a follow-up appointment in six months. Id.

On June 13, 2011, Dunleavy had a follow-up appointment with Dr. Young at which she continued to complain of migraine headaches and reported that the "only [treatment] is avoidance of

electronic devices that trigger [headaches]." Tr. 390. When Dr. Young reviewed Dunleavy's systems, Dunleavy denied fatigue, neck pain and muscle soreness. Tr. 391. Dr. Young reported no objective physical examination findings but opined that Dunleavy suffered from chronic migraines and was "still too disabled by [chronic migraines] to work." Id.  Dr. Young did not specify whether or not he was referring only to Dunleavy's past relevant work as a human resource manager or to all types of work, including unskilled, light work. Furthermore, he did not specify the onset date of Dunleavy's disability and whether it had lasted or was expected to last for 12 or more continuous months. Id.

On July 18, 2011, George Chovanes, M.D., a neurosurgeon, evaluated Dunleavy based on a referral from Dr. Chawluk. Tr. 394-395. Dunleavy was accompanied by her husband to that appointment. Id.  During the appointment a great deal of time was spent discussing their electromagnetic field theory. Tr. 394. The results of a physical examination performed by Dr. Chovanes were completely normal. Tr. 394-395. Dr. Chovanes noted that their electromagnetic theory was "very unusual" but not beyond the realm of possibility.[24] Tr. 395. Dr. Chovanes informed Dunleavy that any sort of operative

---

24. The theory in essence is that the metallic sutures in the skull in conjunction with the metallic aneurysm clip act as an antenna and conduit for the electromagnetic energy or forces into the dura and pia mater of the brain and consequently the resistive forces of the skull which protects the brain from these forces are overcome. The electromagnetic forces than act on naturally occurring ferromagnetic crystals (magnetite) in the brain producing migraine headaches. Tr. 291-293.

removal of her metallic skull wires would be a major endeavor that carried some risks. Tr. 395.

The administrative record does not contain a detailed statement from a treating or examining physician specifying Dunleavy's work-related functional abilities. Furthermore, no treating or examining physician has opined that Dunleavy was disabled from performing any type of work on or prior to December 31, 1999, for the requisite continuous twelve month period or that her disability was expected to last for a continuous twelve-month period or result in death.[25]

The issue is whether Dunleavy was disabled as a result of pain and cognitive impairments stemming from her alleged migraine headaches. There is no indication that she is disabled as a result of her physical exertional and nonexertional abilities, such as sitting, standing, walking, lifting, carrying, pushing, pulling,

---

25. On November 10, 2011, Dunleavy had an appointment with Dr. Chawluk complaining of frequent migraine headaches. Tr. 438.  The record of this appointment (designated Ehibit 17F) was not submitted to the administrative law judge. The exhibits submitted to the administrative law judge ended with Exhibit 16F. Also, on April 4, 2012, Neeraj Dubey, M.D., an associate of Dr. Chawluk issued a "To Whom It May Concern" letter in which he stated that "Mrs. Dunleavy continues to be disabled from any kind of gainful employment due to her debilitating migraines as well as her cognitive impairment." Tr. 71.  This letter was not submitted to the administrative law judge.  Furthermore, the record does not reveal that Dr. Dubey at any point treated or examined Dunleavy. Also, Dr. Dubey did not specify the onset date of Dunleavy's disability and whether it had lasted or was expected to last for 12 or more continuous months.

stooping and reaching.[26]

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Dunleavy had not engaged in substantial gainful work activity during the period from her alleged onset date of October 20, 1994, through her date last insured of December 31, 1999. Tr. 88. The administrative law judge found that the work performed after the alleged disability onset date in 2002, 2006 and 2007, did not amount to substantial gainful activity. Id.

At step two of the sequential evaluation process, the administrative law judge found that Dunleavy had the following severe impairments: "headaches, status post subarachnoid hemorrhage[.]" Id. The administrative law judge concluded that the headaches were a severe impairment because they had "more than a minimal impact on [Dunleavy's] ability to perform some work-related activities.[]" Id. As will be elaborated on below, the administrative law judge specified those work-related limitations when setting the residual functional capacity.

At step three of the sequential evaluation process the

---

26. Exertional demands are the strength demands of an occupation, i.e., sitting, standing, walking, lifting, carrying, pushing or pulling. 20 C.F.R. § 404.1569a(b). Nonexertional demands are demands of a job other than the strength demands. Id. Examples of those nonexertional limitations are difficulty functioning because of nervousness, anxiety or depression; difficulty maintaining attention or concentration; difficulty understanding or remembering instructions; difficulty hearing or seeing; difficulty tolerating exposure to certain environments; and difficulty engaging in manipulative or postural activities such as reaching, stooping or fingering. Id.

administrative law judge found that Dunleavy's impairments did not individually or in combination meet or equal a listed impairment. Tr. 88-89.

At step four of the sequential evaluation process the administrative law judge found that Dunleavy could not perform her prior relevant semi-skilled to skilled, sedentary to light work as a personnel clerk and supervisor, human resources assistant and a retail clerk but that she had the ability to engage in the full-range of unskilled work at all exertional levels but with certain nonexertional limitations. Tr. 89 and 91-92.  Specifically, the ALJ limited Dunleavy to occasional balancing, stooping, kneeling, crouching and crawling; she had to avoid exposure to loud noise, fumes, odors, dust, gases, poor ventilation and chemicals; she could not perform work that required exposure to electromagnetic fields such as computers, printers, microwave ovens, television sets, generators, electric motors and fluorescent lighting; and she was limited to understanding, remembering and carrying out simple instructions. Tr. 89.  In setting this residual functional capacity, the administrative law judge considered (1) Dunleavy's medical records which revealed that Dunleavy did not have any significant physical exertional restrictions; (2) the testimony of Dunleavy and her husband; (3) Dunleavy's activities of daily living, including her ability to perform her own personal care, prepare simple meals, engage in house work, draw and frame artwork, and socialize with others utilizing a telephone and by email. Tr. 91. In addition, the ALJ found that Dunleavy's statements about her pain and functional

27

limitations were not credible to the extent that they were inconsistent with the ability to engage in unskilled work as described above. Tr. 90.

Based on the above residual functional capacity and the testimony of a vocational expert the administrative law judge found that Dunleavy could perform work as a handpacker, sorter and locker room attendant and that there were a significant number of such jobs in the state and national economies. Tr. 92.  The vocational expert specifically indicated that these jobs could be performed by an individual such as Dunleavy who needed to avoid exposure to computers and other electric devices. Tr. 176-180. Consequently, the administrative law judge denied Dunleavy's claim for disability insurance benefits. Tr. 93.

The administrative record in this case is 574 pages in length, primarily consisting of medical and vocational records. Dunleavy argues that the ALJ erred by (1) failing to consider relevant medical and expert evidence and Dunleavy's subjective complaints; and (2) failing to properly analyze all of the claimant's limitations. She also argues generally that the ALJ's decision is not supported by substantial evidence and that the Appeals Council failed to consider all relevant evidence in its determination. We have thoroughly reviewed the record in this case and find no merit in Dunleavy's argument. The administrative law judge did an excellent job of reviewing Dunleavy's vocational history and medical records in her decision. Tr. 86-93.

Furthermore, the brief submitted by the Commissioner thoroughly reviews the medical and vocational evidence in this case. Doc. 10, Brief of Defendant.

No treating or examining physician has indicated that Dunleavy suffers from physical or mental functional limitations that would preclude her from engaging in the range of work set by the administrative law judge in her decision for the requisite 12-month statutory period.

The Social Security regulations require that an applicant for disability benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled."  20 C.F.R. § 404.1512(c).  Dunleavy failed to provide such evidence.  Absent from the record is any medical evidence that Dunleavy suffered from physical or mental functional limitations that would preclude her from engaging in the range of work set by the administrative law judge for the requisite statutory continuous 12-month period.

As for Dunleavy's claim that the Appeals Council erred when it did not grant review, there is no statutory authority for this court to review such denial. Our review is limited to determining whether the final decision of the Commissioner is supported by substantial evidence and when the Appeals Council denies review the decision of the ALJ is the final decision of the

Commissioner. See Matthews v. Apfel, 239 F.3d 589, 594 (3d Cir. 2001).

To the extent that Dunleavy argues that the administrative law judge did not properly consider her credibility, the administrative law judge was not required to accept Dunleavy's claims regarding her physical and mental limitations and her subjective complaints of pain. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make).  It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility.").  Because the administrative law judge heard Dunleavy testify as well as observed and heard her husband testify, the administrative law judge is the one best suited to assess their credibility.

We are satisfied that the administrative law judge appropriately considered all of the medical evidence and took into

account all of Dunleavy's physical and mental limitations in the residual functional capacity assessment. The administrative law judge concluded that Dunleavy could engage in a limited range of work from a mental standpoint.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.

s/ James M. Munley
United States District Judge

Dated: September 16, 2014

31